**STATE of Minnesota, Respondent,**

v.

**Helen Catherine ULVINEN, Appellant.**

**No. 81–130.**

Supreme Court of Minnesota.

Dec. 17, 1981.

Doyle & Michales, Stephen Patrick Doyle and Rosanne Wirth, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief Asst. County Atty., Appellate Section, and Rick Osborne, Staff Atty., Minneapolis, for respondent.

OTIS, Justice.

Appellant was convicted of first degree murder pursuant to Minn.Stat. § 609.05, subd. 1 (1980), imposing criminal liability on one who "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures" another to commit a crime. We reverse.

Carol Hoffman, appellant's daughter-in-law, was murdered late on the evening of August 10th or the very early morning of August 11th by her husband, David Hoffman. She and David had spent an amicable evening together playing with their children, and when they went to bed David wanted to make love to his wife. However, when she refused him he lost his temper and began choking her. While he was choking her he began to believe he was "doing the right thing" and that to get "the evil out of her" he had to dismember her body.

After his wife was dead, David called down to the basement to wake his mother, asking her to come upstairs to sit on the living room couch. From there she would be able to see the kitchen, bathroom, and bedroom doors and could stop the older child if she awoke and tried to use the bathroom. Appellant didn't respond at first but after being called once, possibly twice, more she came upstairs to lie on the couch. In the meantime David had moved the body to the bathtub. Appellant was aware that while she was in the living room her son was dismembering the body but she turned her head away so that she could not see.

After dismembering the body and putting it in bags, Hoffman cleaned the bathroom, took the body to Weaver Lake and disposed of it. On returning home he told his mother to wash the cloth covers from the bathroom toilet and tank, which she did. David fabricated a story about Carol leaving the house the previous night after an argument, and Helen agreed to corroborate it. David phoned the police with a missing person report and during the ensuing searches and interviews with the police, he and his mother continued to tell the fabricated story.

On August 19, 1980, David confessed to the police that he had murdered his wife. In his statement he indicated that not only had his mother helped him cover up the crime but she had known of his intent to kill his wife that night. After hearing Hoffman's statement the police arrested appellant and questioned her with respect to her part in the cover up. Police typed up a two-page statement which she read and signed. The following day a detective questioned her further regarding events surrounding the crime, including her knowledge that it was planned.

Appellant's relationship with her daughter-in-law had been a strained one. She moved in with the Hoffmans on July 26, two weeks earlier to act as a live-in babysitter for their two children. Carol was unhappy about having her move in and told

friends that she hated Helen, but she told both David and his mother that they could try the arrangement to see how it worked.

On the morning of the murder Helen told her son that she was going to move out of the Hoffman residence because "Carol had been so nasty to me." In his statement to the police David reported the conversation that morning as follows:

A. Sunday morning I went downstairs and my mom was in the bedroom reading the newspaper and she had tears in her eyes, and she said in a very frustrated voice, "I've got to find another house." She said, "Carol don't want me here," and she said, "I probably shouldn't have moved in here." And I said then, "Don't let what Carol said hurt you. It's going to take a little more period of readjustment for her." Then I told mom that I've got to do it tonight so that there can be peace in this house.

Q. What did you tell your mom that you were going to have to do that night?

A. I told my mom I was going to have to put her to sleep.

Q. Dave, will you tell us exactly what you told your mother that morning, to the best of your recollection?

A. I said I'm going to have to choke her tonight and I'll have to dispose of her body so that it will never be found. That's the best of my knowledge.

Q. What did your mother say when you told her that?

A. She just—she looked at me with very sad eyes and just started to weep. I think she said something like "it will be for the best."

David spent the day fishing with a friend of his. When he got home that afternoon he had another conversation with his mother. She told him at that time about a phone conversation Carol had had in which she discussed taking the children and leaving home. David told the police that during the conversation with his mother that afternoon he told her "Mom, tonight's got to be the night."

Q. When you told your mother, "Tonight's got to be the night," did your mother understand that you were going to kill Carol later that evening?

A. She thought I was just kidding her about doing it. She didn't think I could. * * *

Q. Why didn't your mother think that you could do it?

A. * * * Because for some time I had been telling her I was going to take Carol scuba diving and make it look like an accident.

Q. And she said?

A. And she always said, "Oh, you're just kidding me." * * *

Q. But your mother knew you were going to do it that night?

A. I think my mother sensed that I was really going to do it that night.

Q. Why do you think your mother sensed you were really going to do it that night?

A. Because when I came home and she told me what had happened at the house, and I told her, "Tonight's got to be the night," I think she said, again I'm not certain, that it would be the best for the kids."

Appellant raises issues concerning the denial of her constitutional right to confrontation, the admissibility of hearsay testimony of statements of the deceased, the admission of the statement of her son and the sufficiency of the evidence. We address only the issues of the prejudicial nature of the admission of statements of the deceased regarding her feelings about appellant and the sufficiency of the evidence to support a verdict of first degree murder.

■ The statements to which appellant objects were introduced at trial through the testimony of friends and neighbors of the deceased, and related to her feelings about her mother-in-law. The comments of the deceased indicated that she hated her mother-in-law, was unhappy about her moving in, did not believe that she was a good babysitter and was afraid that she or the children would be poisoned and that it was

therefore necessary to hide all the dangerous substances in the house. They were admitted as state of mind exceptions to the hearsay rule. Carol Hoffman's state of mind was not at issue in the case. These statements, which were extremely prejudicial, were likely to lead the jury to conclude that the deceased was afraid of her mother-in-law and therefore appellant probably disliked her enough to kill her. The admission of these statements was prejudicial error which would normally require a new trial. However, our decision that the evidence is insufficient to support a verdict of first degree murder requires instead that we reverse without remanding for a new trial.

█ In reviewing a claim of sufficiency of the evidence we must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill*, 274 N.W.2d 99 (Minn.1978). The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Wahlberg*, 296 N.W.2d 408 (Minn. 1980).

█ It is well-settled in this state that presence, companionship, and conduct before and after the offense are circumstances from which a person's participation in the criminal intent may be inferred. *State v. Parker*, 282 Minn. 343, 164 N.W.2d 633 (1969). The evidence is undisputed that appellant was asleep when her son choked his wife. She took no active part in the dismembering of the body but came upstairs to intercept the children, should they awake, and prevent them from going into the bathroom. She cooperated with her son by cleaning some items from the bathroom and corroborating David's story to prevent

anyone from finding out about the murder. She is insulated by statute from guilt as an accomplice after-the-fact for such conduct because of her relation as a parent of the offender. *See* Minn.Stat. § 609.495, subd. 2 (1980). The jury might well have considered appellant's conduct in sitting by while her son dismembered his wife so shocking that it deserved punishment. Nonetheless, these subsequent actions do not succeed in transforming her behavior prior to the crime to active instigation and encouragement. Minn.Stat. § 609.05, subd. 1 (1980) implies a high level of activity on the part of an aider and abettor in the form of conduct that encourages another to act. Use of terms such as "aids," "advises," and "conspires" requires something more of a person than mere inaction to impose liability as a principal.

The evidence presented to the jury at best supports a finding that appellant passively acquiesced in her son's plan to kill his wife. The jury might have believed that David told his mother of his intent to kill his wife that night and that she neither actively discouraged him nor told anyone in time to prevent the murder. Her response that "it would be the best for the kids" or "it will be the best" was not, however, active encouragement or instigation. There is no evidence that her remark had any influence on her son's decision to kill his wife. Minn.Stat. § 609.05, subd. 1 (1980), imposes liability for actions which affect the principal, encouraging him to take a course of action which he might not otherwise have taken. The state has not proved beyond a reasonable doubt that appellant was guilty of anything but passive approval. However morally reprehensible it may be to fail to warn someone of their impending death, our statutes do not make such an omission a criminal offense.[1]

█ David told many people besides appellant of his intent to kill his wife but no

---

1. We note that mere knowledge of a contemplated crime or failure to disclose such information without evidence of any further involvement in the crime does not make that person liable as a party to the crime under any state's statutes.

*See* T. Gardner and V. Manion, *Criminal Law* 85–6 (1975). For a survey of the criminal consequences of failure to rescue a person in serious danger, see F. Feldbrugge, *Good and Bad Samaritans*, 14 Am.J.Comp.L. 630 (1966).

one took him seriously. He told a co-worker, approximately three times a week that he was going to murder his wife, and confided two different plans for doing so. Another co-worker heard him tell his plan to cut Carol's air hose while she was scuba diving, making her death look accidental, but did not believe him. Two or three weeks before the murder, David told a friend of his that he and Carol were having problems and he expected Carol "to have an accident sometime." None of these people has a duty imposed by law, to warn the victim of impending danger, whatever their moral obligation may be. The state has not proved beyond a reasonable doubt that appellant was guilty of any of the activities enumerated in the statute. Appellant's comment is not sufficient additional activity on her part to constitute planning or conspiring with her son. She did not offer advice on how to kill his wife, nor offer to help him. She did not plan when to accomplish the act or tell her son what to do to avoid being caught. She was told by her son that he intended to kill his wife that night and responded in a way which, while not discouraging him, did not aid, advise, or counsel him to act as he did. Where, as here, the evidence is insufficient to show beyond a reasonable doubt that appellant was guilty of active conduct sufficient to convict her of first degree murder under Minn.Stat. § 609.05, subd. 1 (1980), her conviction must be reversed.

YETKA, Justice (concurring specially).

I concur in the finding that it is difficult to justify a conviction for first degree murder—perhaps third degree murder or manslaughter is more appropriate.

However, I disagree with that portion of the majority opinion which finds the statements by the deceased inadmissible. I believe the trial court properly admitted the statements for the reasons it set forth.