**STATE of Minnesota, Respondent,**

v.

**David Boyd STAUFFACHER, Appellant.**

No. C6–85–1124.

Court of Appeals of Minnesota.

Jan. 28, 1986.

Review Denied March 21, 1986.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert Carolan, Dakota Co. Atty., Mark Nathan Lystig, Asst. Dakota Co. Atty., Hastings, for respondent.

C. Paul Jones, State Public Defender, Mary C. Cade, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by SEDGWICK, P.J., and RANDALL and CRIPPEN, JJ., with oral argument waived.

## OPINION

RANDALL, Judge.

From the judgment of conviction, David Boyd Stauffacher appeals his conviction of two counts of first degree criminal sexual conduct, Minn.Stat. §§ 609.342(c) (1984), reasonable fear of imminent great bodily harm, and 609.342(e)(i) (1984), personal injury; one count of third degree criminal sex-

ual conduct, Minn.Stat. § 609.344(c) (1984); one count of kidnapping, Minn.Stat. § 609.-23, subd. 1(2) (1984); and one count of unauthorized use of a motor vehicle, Minn. Stat. § 609.55, subd. 2 (1984).

The court vacated the third degree criminal sexual conduct conviction as a lesser-included count and sentenced appellant to 240 months on one conviction of first degree criminal sexual conduct, Minn.Stat. § 609.342(c). Appellant's criminal history score was eight, first degree criminal sexual conduct is a severity level eight offense, and the presumptive sentence is 135 months.

Stauffacher appeals the trial court's upward departure from the presumptive sentence. He also challenges the sufficiency of the evidence and the pretrial lineup procedure. We affirm in part and vacate in part.

### FACTS

On June 20, 1984, at approximately 6:00 p.m., L.K. and her friend, Kathy, drove to Bullrushes Bar in Burnsville in Kathy's silver-blue Sapporo. During the course of the evening, L.K. drank two or three gin and tonics and a beer. Between 8:00 and 9:30 Bullrushes served free drinks for a cover charge.

Between 10:30 and 11:00 p.m. Kathy and L.K. walked out of Bullrushes and into the parking lot with two men they had met. L.K. used Kathy's keys to turn on her car stereo. As the four stood talking, a third man (found by the jury to be appellant) carrying a flowered suitcase approached the group. He asked the group if they had seen his black corvette. L.K. recalled the man wore jeans, a tee shirt with the words "Kingman, Arizona" on it, and tennis shoes. At some point after appellant joined the group, Kathy left on foot, intending to return later.

As L.K. conversed with appellant, appellant said something she thought was Spanish. After the two men L.K. had been speaking to left, L.K. began to enter the Sapporo. Appellant followed L.K. to the

driver's door, shoved her over into the passenger's seat and got into the driver's seat. He put his arm around her neck so that her head was in the crook of his arm. He told L.K. to shut up or he would kill her. He then drove L.K. to a construction site, forcing her to operate the car's stick shift as he drove. Appellant continued threatening to kill L.K. during the drive to the construction site.

When appellant stopped the car, he ordered L.K. to take off her clothes. He was pulling L.K. by the hair at this point. He then forced her into the back seat and pulled down his pants. He grabbed her neck with his hands, his thumbs on the outside of her neck, and again told her he was going to kill her.

Appellant alternately and forcibly penetrated L.K.'s vagina and anus with his penis. The assault lasted between forty-five minutes to an hour. He did not ejaculate. When appellant finished assaulting L.K., he ordered her to get dressed and to drive the car to Kingman, Arizona. L.K. told him the car needed gas and he ordered her to drive to a gas station. Because L.K. was unfamiliar with Burnsville, she drove to a Superamerica gas station on 66th Street in Richfield near her parents' home. While L.K. was driving, appellant had his hands in her pants preventing her from moving.

When they reached the Superamerica station, appellant pushed L.K. into the passenger's seat and crawled over her into the driver's seat. L.K. told appellant she had some money for gas in her purse. As she reached for her purse, she put the clothing she had been unable to put on into her purse. Appellant started to drive away from the gas station. L.K. then jumped from the car and ran toward the Superamerica store. Appellant attempted to run her down with the car. He then drove from the parking lot at high speed.

L.K. ran into the Superamerica store and told the assistant manager, Daniel Ekblad, that she had been raped. Ekblad dialed 911, which, in turn, contacted the Richfield police. The woman who answered the 911 call stayed on the phone with L.K. until the police arrived. Ekblad testified that L.K. came into the Superamerica at around 1:00 a.m. as he was doing his routine cigarette count off the tills.

Because the rape occurred in Burnsville, the Richfield police turned the matter over to the Burnsville police. Burnsville Police Officer Lidster took L.K. to the rape scene and then questioned her. He then took her to Fairview Ridges Hospital for a sexual assault examination.

L.K. did not complain to the emergency room personnel of injury. At trial she testified that following the incident she suffered from a sore neck, difficult bowel movements, and mental injury.

Later that evening, while Officer Leech was working at the Burnsville police station on another matter, he overheard Officer Vivant discussing L.K.'s rape. After overhearing Officer Vivant's description of the suspect, he told Officer Vivant he believed appellant was the same man he had encountered during an unrelated incident earlier that evening, around 10:35 p.m., at Bullrushes. Appellant informed Officer Leech that he had witnessed the incident, and offered to give a statement. Appellant told Officer Leech that he had rented a black corvette and was on his way to Vegas, New Mexico. He gave Officer Leech what later proved to be a fictitious address and phone number in Vegas.

Officer Leech described appellant as approximately 45–50 years old, 5'10", heavy build, weight of 190 pounds, with dark hair, no facial hair, wearing dark pants, a tee shirt with some writing on it and a light jacket. Officer Leech made an in-court identification of appellant as the man to whom he had spoken at Bullrushes.

Forty to forty-five minutes after Kathy left L.K. June 20, she returned to Bullrushes' parking lot. She found her car gone and the flowered suitcase appellant had been carrying in the lot where her car had been. She sat down to decide what to do when a car pulled up, a woman got out, took the suitcase, and left. Later that eve-

ning, the flowered suitcase was turned in to Bullrushes by an unidentified woman. After closing, Bullrushes turned the suitcase over to the police.

The next day L.K. gave her statement to Detective Free of the Burnsville Police Department. L.K. described her assailant as being of Mexican-American descent, 45 years of age, approximately 5'7", 175 pounds, with a moustache. She told Officer Free that she thought appellant had been a member of the band at Bullrushes.

L.K. returned to Minnesota from her out-of-state college for Christmas break in December. On December 31, 1984, she went to the Hennepin County jail to view a lineup the judge had ordered at the omnibus hearing.

L.K. rode the elevator to the jail with Detective Free and Officer Holden. Free and Officer Holden were standing in front of L.K. on the elevator. On the fourth floor the elevator doors opened. Appellant and his attorney were seated approximately 30 feet from the elevator door. Free immediately noticed appellant and he and Officer Holden turned around to face L.K. and block her view. Free advised L.K. to face the rear of the elevator. L.K. testified that she did not see appellant.

L.K. was taken to the lineup room later that day. When she viewed the five men in the lineup, she requested each of the men to say "Have you seen my corvette?" At that point she identified appellant as her assailant. She testified that she hesitated because appellant had a beard at the lineup. Once she heard his voice, she made a positive identification of appellant. She also made a positive, in-court identification of appellant, who had been ordered to shave his beard for trial. Kathy was unable to identify appellant from a photo lineup or to make a positive in-court identification.

On June 22, the day after the incident, Kathy's car was located in Richfield. The car was towed to the Burnsville police station, searched, dusted for prints and checked for semen, blood and hair samples. Appellant's empty leather wallet, part of L.K.'s necklace, torn from her neck by appellant during the assault, and other articles were found. None of the fingerprints lifted from the car belonged to appellant. No semen or hair from appellant was found on L.K.'s clothing.

An inventory of the flowered suitcase turned up appellant's probation agreement, his probation officer's card and a number of documents which mentioned Kingman and Mojave County, Arizona.

Appellant testified at trial that he had hitchhiked to Bullrushes and taken a dollar from the person who gave him the ride so he could get in to the bar. He also testified that he had $45 in his wallet, but he did not want to spend that because it had to last him until he got to Kingman.

He testified that he left his suitcase in an open closet near the bouncer at Bullrushes. He had nine or ten drinks, took his suitcase, and left the bar around 10:30. He noticed a fight outside the door, took his suitcase around the corner and set it in some tall grass. He returned to the scene of the fight and talked to some people. He claimed he did not talk to the police officer at the scene. When he went to retrieve the suitcase, he claims it was gone. He claimed he walked to nearby Highway 35 and slept below the freeway that night. He denied having any contact with L.K.

## ISSUES

1. Was the evidence sufficient to sustain appellant's conviction?

2. Was the pretrial lineup procedure tainted?

3. Did the trial court abuse its discretion in imposing an aggravated sentence on appellant?

## ANALYSIS

### I.

*Sufficiency of the evidence*

■ In reviewing a claim of sufficiency of the evidence, we must determine whether, under the facts in the record and any

legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). "The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence." *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981).

If a jury regards the presumption of innocence, and finds the State has overcome it beyond a reasonable doubt, and can "reasonably conclude from the evidence contained in the record that the defendant was guilty of the offense charged, we will not disturb its verdict." *State v. Dodis*, 314 N.W.2d 233, 237 (Minn.1982) (citations omitted).

Appellant claims the evidence was insufficient to convict him because L.K.'s identification of him as her assailant was unreliable. He claims the description L.K. gave police was "vague" and that L.K. had inadequate opportunity to observe her assailant due to poor lighting conditions during the assault. He raises additional specific points: (1) L.K.'s description of the assailant omitted mention of tattoos. Appellant has 33 tattoos on his body. (2) L.K. said her assailant was Mexican-American in appearance. Appellant is not Mexican-American. (3) L.K. thought her assailant may have been a member of the band at Bullrushes. Appellant was not a member of the band. (4) L.K. did not positively identify appellant in the lineup until she heard his voice. (5) L.K.'s trial description of appellant was "tentative and sketchy." (6) L.K. was feeling the effects of alcohol she had consumed at Bullrushes.

Appellant claims L.K.'s lineup identification of him was weak because she had to hear his voice prior to making her identification. We find this argument unpersuasive because between the time of the crime and the lineup, appellant had grown a beard which greatly changed his appearance. Once L.K. heard appellant's voice, even with the change in his appearance,

she made a positive, not a tentative, identification. Moreover, L.K.'s identification of appellant was tested by appellant through a rigorous cross-examination. The jury believed L.K.'s testimony that appellant was her assailant.

Appellant makes much of the fact that L.K. erroneously described him as Mexican-American and that she failed to mention appellant's tattoos. However, during the omnibus hearing, the State's attorney noted that others, including appellant's probation officer, also described appellant to the Burnsville police as "A male caucasian, who appears to be of Mexican-American heritage." Apparently, appellant can legitimately be mistaken as Mexican-American in appearance.

Appellant testified at trial that he has two tattoos on each arm. He claims L.K.'s failure to mention tatoos is evidence she misidentified appellant as her assailant. Officer Leach testified appellant was wearing a jacket. Viewing the evidence in the light most favorable to the State, the jury could reasonably have believed either that the tattoos were covered at the time of the assault or that L.K.'s identification of appellant was accurate for other reasons.

L.K.'s identification of appellant was corroborated by Officer Leech's positive identification of appellant as the man he had spoken to following the altercation between the couple and the bouncer at Bullrushes.

▪ Appellant's contention that the evidence presented at trial was legally insufficient to convict him does not convince us. Here, L.K. made a positive identification at the lineup and in court. The inconsistencies appellant points out in L.K.'s identification do not overcome L.K.'s lineup and in-court identification. The jury could reasonably conclude from the evidence presented that appellant was guilty of the offense charged.

## II.

### Pretrial lineup

Appellant claims L.K.'s seeing him when the elevator doors opened tainted the line-

up and was an impermissible suggestive lineup procedure. He does not claim the lineup itself was tainted.

On the day of trial, immediately before the trial began, the court held an evidentiary hearing on the elevator incident. After taking testimony from Detective Free and appellant, the court ruled that the lineup was neither tainted nor impermissibly suggestive.

■■■ A conviction, based on an in-court eyewitness identification following a pretrial lineup identification, will be set aside only if the procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *See Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The standard is the same for admissibility of testimony concerning the out-of-court identification itself. *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). A substantial likelihood of misidentification violates an appellant's right to due process. *Id.* at 199, 93 S.Ct. at 382.

"Reliability is the linchpin in determining the admissibility of identification testimony * * *. The determination depends on the totality of the circumstances." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). The determination depends on the totality of the circumstances. *Id.* at 115, 97 S.Ct. at 2253. The factors for determining reliability where a suggestive procedure has been used "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* 432 U.S. at 99, 97 S.Ct. at 2245, citing *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Facts must be evaluated on a case by case basis.

Although appellant argues that L.K.'s viewing him prior to the lineup constituted an "impermissibly suggestive procedure," he offers no authority for his argument

that possible viewing of a suspect prior to a lineup is *per se* impermissibly suggestive and warrants reversal. He offers no analysis of the incident in light of the factors of *Neil v. Biggers.*

Instead, he challenges L.K.'s identity of appellant, the supposedly inaccurate description she gave to the police, the fact that L.K. had been drinking and was emotionally distraught at the time she was being attacked, and the fact that L.K. did not positively identify appellant at the lineup until she heard his voice. None of these factors tell how the elevator incident was impermissibly suggestive.

■■■ Testimony of L.K. and Detective Free refuted appellant's contention that L.K. had seen appellant when the doors opened. The trial court was in the best position to judge credibility and did not err in admitting testimony on the lineup identification.

Furthermore, the identification process was not impermissibly suggestive under the *Neil* criteria. L.K. had sufficient opportunity to view appellant at the time of the crime. She spoke with him in the parking lot prior to the rape and she spent over an hour in Kathy's car with appellant while the assault was taking place. She also testified her consumption of alcohol did not hamper her ability to recall. She testified that, although she was in constant fear for her life, she was able to observe and remember appellant's physical characteristics.

L.K. demonstrated a high level of certainty, both at the lineup and in her in-court identification of appellant. The length of time between the assault and the lineup was relatively short, six months, and the time between the assault and the trial, seven to eight months.

■■■ It is clear the lineup, viewed in the totality of the circumstances, did not give rise to a substantial likelihood of misidentification.

The trial court based its decision in part on the fact that even if L.K. had seen

appellant, the incident was not intentional. The court also stated that L.K.'s viewing appellant would not, by itself, taint the lineup unless L.K. knew that the individual appellant was standing next to was appellant's attorney. The trial court properly concluded that the event did not render the lineup likely to cause misidentification.

Danger that convictions may be based on misidentifications "may be substantially reduced by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971. Here appellant's attorney brought out each point raised in his appellate brief during his cross-examination of L.K. The jury was given the opportunity to assess the reliability of L.K.'s identification.

### III.

■ The trial court ordered an upward deviation from the presumptive sentence of 135 months to 240 months. Appellant argues the court must use the presumptive sentence unless the act involved substantial and compelling circumstances. *State v. Garcia*, 302 N.W.2d 643, 647 (Minn.1981). Departure from the presumptive sentence should be reserved for those offenses which, because of any number of factors listed in the guidelines, are *significantly* worse than the typical offense. *State v. Cox*, 343 N.W.2d 641, 643 (Minn.1984).

■ Where, as here, the trial court has given reasons supporting the departure from the presumptive sentence, this court will examine the record to determine if the reasons given justify the departure. "If the reasons given justify the departure, the departure will be allowed." *Williams v. State*, 361 N.W.2d 840, 844 (Minn.1985).

Appellant argues that, given the factors in the Minnesota Sentencing Guidelines II. D.2, the rape for which appellant was convicted does not justify a departure from the presumptive sentence since it was no more serious than the "typical" rape.

The guidelines take seriousness of the offense into account. The comments to Minnesota Sentencing Guidelines II.D.201 indicate that the factors for departure given in that section constitute a non-exclusive list. *State v. Van Gorden*, 326 N.W.2d 633, 634 (Minn.1982). The State argues that the trial court properly departed upward from the recommended sentence.

■ The trial court's reasons for departing upward were appellant's forcible rape of L.K., two forms of penetration, terrorization and threats to kill L.K. whether she complied or not, and, only hours before the rape, appellant's release from jail on a felony assault conviction. Generally, in a case where upward departure is justified, the upper limit is double the presumptive sentence length. *State v. Evans*, 311 N.W.2d 481, 483 (Minn.1981). Appellant's terrorization of L.K. is closely related to the elements of § 609.342(c) and is not a permissible reason to depart from the presumptive sentence. However, use of force is a permissible reason for departing upward from the presumptive sentence. *Van Gorden*, 326 N.W.2d at 635. Likewise, subjecting L.K. to two forms of penetration is a permissible aggravating factor justifying upward departure. *Id.* Appellant's gratuitous use of threats is also justification for departure. *State v. Hamilton*, 348 N.W.2d 112, 115 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. July 26, 1984). Likewise, a departure is proper where appellant has a prior felony conviction in which the victim was injured regardless of whether injury to the victim was an element of either crime. *State v. Peake*, 366 N.W.2d 299, 301 (Minn.1985). We hold the trial court's upward deviation was proper.

On appeal appellant argued that one of his convictions for first degree criminal sexual conduct should be vacated under the provisions of Minn.Stat. § 609.04 (1984). Respondent concedes the two incidents arose from the same behavioral incident and that one of the two convictions should be vacated. We agree and vacate appellant's conviction under Minn.Stat. § 609.-342(e).

Because of our disposition of this issue we need not rule on appellant's alternative

request to reduce the remaining conviction under Minn.Stat. § 609.342(c) to third degree criminal sexual conduct under Minn. Stat. § 609.344(c). Moreover, this issue was not raised at trial or in appellant's statement of the case, and we will not review it on appeal.

### DECISION

The evidence was sufficient to convict appellant. The pretrial lineup was not tainted. The trial court did not err in imposing nearly double the presumptive sentence where aggravating factors were proved at trial. Appellant's conviction under Minn.Stat. § 609.342(e) (personal injury) is vacated.

Affirmed in part, vacated in part.