**STATE of Minnesota, Respondent,**

v.

**Ervin David KENNIE, Appellant.**

**No. C6–85–1253.**

Court of Appeals of Minnesota.

Feb. 4, 1986.

Review Denied April 11, 1986.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

C. Paul Jones, State Public Defender, Mollie G. Raskind, Deputy State Public Defender, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and PARKER and WOZNIAK, JJ., with oral argument waived.

## OPINION

POPOVICH, Chief Judge.

Ervin David Kennie appeals from a conviction of fourth degree criminal sexual conduct, claiming the evidence was insufficient to prove he committed the offense. We affirm.

## FACTS

Reviewing the evidence in the light most favorable to the verdict,[1] the facts are as follows:

On October 17, 1984, about 5:20 p.m., 22-year old R.K. arrived at the downtown St. Paul YWCA on Kellogg Boulevard. Because she was early for her 7:00 p.m. dating class, which she taught with two others, she went to the lounge area and watched swimmers in the pool.

Appellant Ervin David Kennie was also in the lounge with his girlfriend and their two daughters. When the girlfriend and her children, who were staying at the Y, left to go to their room, appellant approached R.K. and asked if she wanted a hamburger at McDonald's. R.K. agreed, and the two walked to a nearby McDonald's restaurant. They then walked toward the Ordway Music Theater, which was under construction. Appellant indicated to R.K. he wanted to collect some money from a bus driver in the vicinity. While appellant used a portable satellite toilet near the construction area, R.K. sat down on a bench to eat her hamburger. Appellant then asked R.K. to come to the satellite to see some writing on the wall. When she was inside, appellant locked the door, unbuttoned her blouse and began kissing or sucking on her breast. R.K. told him to stop, but appellant tried to pull down her slacks. R.K. began to scream, and held onto her slacks. Although appellant tried to choke her and told her he would kill her if she did not pull her slacks down, R.K. continued to scream and hold onto her slacks. Appellant demanded money and valuables and when he discovered she had none, he fled.

R.K. ran back to the YWCA and reported the incident to the security guard at the front desk, who called the police. When interviewed, R.K. told the police she thought she had seen appellant at the Y before and believed his girlfriend lived there. The police contacted the girlfriend who said appellant would be back soon.

Appellant returned to the YWCA and R.K. positively identified him as her assailant. When questioned by the police, appellant stated R.K. had followed him from the YWCA but he pushed her away and went alone to McDonald's.

---

1. *State v. Johnson,* 359 N.W.2d 698, 701 (Minn. Ct.App.1984).

R.K. was taken to a hospital. A doctor noted an ecchymotic (bruise) mark on her breast, which was consistent with a sucking and generation of vascular engorgement—bleeding into the tissue (in lay terms, a "hickey"). He found abrasions and marks around her neck which were consistent with her story she had been choked. Appellant was charged with attempted criminal sexual conduct in the third degree and criminal sexual conduct in the fourth degree. After a court trial without a jury, he was convicted of criminal sexual conduct in the fourth degree.

## ISSUE

Was the evidence sufficient to prove beyond a reasonable doubt appellant was guilty of criminal sexual conduct in the fourth degree?

## ANALYSIS

1. Appellant was convicted of violating Minn.Stat. § 609.345(c) (1984), which provides:

A person is guilty of criminal sexual conduct in the fourth degree * * * if he engages in sexual contact with another person and if any of the following circumstances exists:

\* \* \* \* \* \*

(c) The actor uses force or coercion to accomplish the sexual contact * * *.

Appellant claims R.K.'s story was untrustworthy because it was uncorroborated, contradicting, conflicting and inconsistent. The appellant first notes although R.K. told the doctor and the police officer she had been pushed into the satellite, she told an investigator and testified at trial she was coerced into the satellite by appellant. In addition, the YWCA security officer testified R.K. told him she was pushed down near the construction area.

Appellant also points to conflicting testimony regarding appellant's subsequent actions. R.K. testified appellant had never gotten her slacks down, which was consistent with her story to the examining physician; however, the police officer testified

R.K. told him appellant had "pulled down her outer pants and then her panties * * * [b]ut after he got her pants off and her panties down she began to scream * * *." Upon crossexamination, the officer stated appellant had "removed" both her slacks and her panties. The security officer also stated R.K. told him appellant "had her pants all the way off * * * and said like she had been raped but didn't say exactly— no detail after that, really." He also stated: "I think she said a couple weeks or like two weeks prior to that that something similar to that had happened to her."

Appellant appears to suggest R.K.'s testimony is not credible because she is retarded. However, there was no evidence of this, aside from one statement by the prosecutor to the court that R.K. "is diagnosed as a border-line retarded."

The State points out portions of appellant's story are also untrustworthy. For example, appellant claims he pushed R.K. away only a couple blocks from the YWCA; yet R.K. knew he had purchased a hamburger at McDonald's. Appellant also testified he had been drinking peppermint schnapps and was "like on the side of not being bothered," and bought another bottle of schnapps and marijuana after he went to McDonald's. When he returned to the Y, he testified the police gave his marijuana to his girlfriend to keep.

The State also claims appellant told the police he had brought grapes and sandwiches for his girlfriend and her children. The actual testimony by the girlfriend was that she had left appellant at the Y to go upstairs to feed the children and appellant told her he was going to McDonald's. The police officer testified appellant was in the lunchroom of the YWCA and he brought them grapes and a sandwich to eat at that time.

2. In *State v. Ulvinen*, 313 N.W.2d 425 (Minn.1981), the Minnesota Supreme Court, explaining the standard for reviewing a claim of insufficient evidence, said:

In reviewing a claim of sufficiency of the evidence we must determine whether, under the facts in the record and any

legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence.

*Id.* at 428 (citation omitted). The fact finder is the sole judge of credibility and may believe part and reject part of a witness's testimony even if it appears the witness has knowingly and willfully testified falsely as to a material fact. *State v. Poganski,* 257 N.W.2d 578, 581 (Minn.1977). In *State v. Hamilton,* 289 N.W.2d 470 (Minn.1979), the court stated the fact finder must be deferred to, despite minor inconsistencies in the State's case and the relative inconclusiveness of the supporting evidence. *Id.* at 477.

In this matter, the trial court specifically noted the discrepancies in R.K.'s stories to various persons, yet nonetheless found her story credible. Positive testimony by a victim, the victim's prompt complaint, testimony regarding the victim's emotional state, and corroborating medical evidence have been held sufficient to support a conviction. *State v. Reinke,* 343 N.W.2d 660, 662 (Minn.1984).

Although appellant claims the medical evidence was not conclusive because the examining physician testified R.K.'s "hickey" *could* have been caused by a sharp blow and *could* have occurred earlier that day, but the physician testified:

> There are some characteristics of a hickey that are a little bit different, and that is that it typically has some small little red pinpoint spots in it that you term petechiae, and that happens because the vessels break differently, and it's a little different and if you get bruised and get black and blue spots, then it's a combination, and her's was most consistent with a hickey.

The physician also testified the marks on R.K.'s neck were more consistent with choking than with the appellant's story that he had pushed her away.

## DECISION

Despite discrepancies in the victim's recounting the incident to various persons, the evidence was sufficient to convict appellant of sexual conduct in the fourth degree.

Affirmed.