STATE of Minnesota, Respondent,

v.

Hansakada SOUVANNARATH, Appellant.

No. C2–95–1445.

Supreme Court of Minnesota.

March 22, 1996.

Arthur R. Martinez, Minneapolis, for appellant.

Gayle C. Hendley-Zappia, Asst. Hennepin County Atty., Jean E. Burdorf, Staff Atty., Hennepin County Atty's. Office, Minneapolis, for respondent.

## OPINION

TOMLJANOVICH, Justice.

On April 17, 1994, appellant Hansakada Souvannarath was the driver in a drive-by shooting which occurred at a soccer field in Richfield. The shooting left Orlando Enrique Guevara dead, and two other adults and one juvenile injured. On April 23, 1994, Souvannarath turned himself in to Richfield police. On May 24, 1994, a Hennepin County Grand Jury indicted Souvannarath for one count of first-degree murder in violation of Minn.Stat. §§ 609.185(1), 609.11 and 609.05 (1994); three counts of attempted first-degree murder in violation of Minn.Stat. §§ 609.185(1), 609.05 and 609.17 (1994); and three counts of attempted second-degree murder in violation of Minn.Stat. §§ 609.19(1), 609.11, 609.05 and 609.17 (1994). On March 30, 1995, a Hennepin County jury found Souvannarath guilty on all counts. He was subsequently sentenced for the first-degree murder and attempted first-degree murder convictions.

On April 17, 1994, Nelson Romero, Alejandro Romero, Jose Sanchez and Valentine Valenzuela were on their way to play soccer with other El Salvadoran immigrants at the soccer field on 76th Street and Lyndale Avenue in Richfield. As they were driving to the field, a car with three Asian men and two women pulled alongside them. One of the Asian men gave Alejandro Romero a "rough" look. Alejandro returned the look with an offensive hand gesture. As the El Salvadorans continued towards the field, they noticed that the other car was following. Once at the field, the Asian men, later identified as Johnny Hesston, Son Dac Ho, and appellant Hansakada Souvannarath, left their car and approached the El Salvadorans. An altercation ensued. Though each faction threatened the other with various improvised weapons, there were no injuries. Eventually, with Souvannarath driving, the three Asian men retreated in the blue 4-door Mazda in which they had arrived.

The El Salvadorans returned to the field and began to play soccer. During the game, one of the players was injured and carried to the sidelines. Alejandro Romero walked over and stood by the group that had gathered around the injured man. Just then, the blue Mazda returned. Souvannarath was driving, Son Dac Ho was in the front passenger seat, and Hesston was in the rear passenger-side seat. As the car drew near, it slowed. One of the passengers screamed "you sons of bitches." Hesston then leaned out the back window, leveled a pistol at the crowd, and fired five shots.

The shooting left one man dead and three others wounded. None of the persons shot were involved in the previous scuffle with the Asians. Two of the victims suffered minor wounds. A third victim suffered significant permanent injuries. The final victim, Orlando Guevara, was shot in the chest and died of exsanguination.

After the shooting, Richfield police set up a task force to follow up on leads. On April 20, 1994, the car driven by the perpetrators in the shooting was found abandoned in a church parking lot and burned in a fire. The vehicle was registered to Souvannarath's father and had been reported stolen from Souvannarath's apartment earlier that day. Souvannarath's friend, Ricky Phalaket, would later testify that Souvannarath had his brother-in-law burn the Mazda.

Further investigation led police to Phetilia Sivongsa. Sivongsa knew Souvannarath from playing basketball with him at Meadowland Park in Eagan. On the day of the shooting, Sivongsa saw Souvannarath and two other men arrive at the park in a blue car. The three had a conversation with Ricky Phalaket which Sivongsa overheard. The men said that they had been jumped at the soccer field and had shot someone. Sivongsa also overheard someone say that the gun should be thrown in the park's pond.

On April 23, 1994, police dredged the Meadowland Park pond and recovered a 5–shot, .38 caliber Smith & Wesson revolver. The gun contained 5 spent casings; no live rounds were found. Although an exact match could not be made, a ballistics expert determined that this gun could have fired the bullet recovered from Guevara's body.

After learning that they were looking for him, Souvannarath turned himself in to the Richfield police. Son Dac Ho was arrested the same day at a bus station in St. Cloud. Ho gave a statement to the police implicating himself, Hesston and Souvannarath in the shooting. Hesston was arrested the next day at the Minneapolis–St. Paul International Airport carrying a plane ticket to California.

Souvannarath's trial commenced on March 14, 1995, in Hennepin County District Court. Son Dac Ho was the only co-defendant to testify. Ho testified that he had come to the Twin Cities from California just days before the shooting. He brought Johnny Hesston with him and both stayed with Souvannarath. According to Ho, as he, Souvannarath, Hesston and the two women were driving away from the fight with the El Salvadorans at the soccer field, Souvannarath said, "do you want to get the gun?" Hesston responded "yeah." They then returned to Souvannarath's apartment. Souvannarath went in and when he returned he showed Ho a gun tucked in the waistband of his pants. He then got back into the car and placed the gun between himself and Ho on the front seat.

Ho testified that "it was pretty obvious" that they were going back to the field to shoot the El Salvadorans. En route, Ho picked up the gun, turned to Hesston in the back seat, and asked if Hesston wanted to shoot. Hesston replied "yeah, I'll shoot." As the three men approached the field, Hesston told Souvannarath to slow the car down. Appellant complied. Ho told the jury that he saw Hesston roll down the back window and then heard a number of shots. Ho testified that after the shooting, he, Souvannarath, and Hesston went to Meadowland Park to dispose of the gun. After a brief conversation at the park with Souvannarath's friend,

Ricky Phalaket, Souvannarath went into the woods towards the pond to dump the gun.

Souvannarath's girlfriend, Phatthana Nanthavangsa a/k/a "Bing" testified that she was in Souvannarath's car during the first altercation at the soccer field. She told the jury that after they left the field, Hesston said that he wanted to go back to shoot the men with whom they had been fighting. In her statement to the police, Bing indicated that Souvannarath responded by saying "okay, that's cool." However, at trial she testified that Souvannarath said nothing. Souvannarath and the others then dropped Bing and the other woman off at his apartment. Although in her initial statement to the police, Bing indicated that she saw Souvannarath take a gun from his bedroom before leaving, at trial, she denied making this statement. Bing testified only that he went into his bedroom to get his basketball jersey. Bing also admitted that she told police that after returning to the apartment later that evening, Souvannarath told her that Hesston had done the shooting and that the gun had been thrown in a pond at Meadowland Park.

Ricky Phalaket also corroborated the testimony of Son Dac Ho, Souvannarath's co-defendant. Phalaket testified that on the day of the shooting, he was with Souvannarath, Hesston, and Ho at Meadowland Park. Souvannarath told Phalaket about the fight at the soccer field and Hesston admitted that he "did a 187" (apparently, slang for murder). Phalaket testified that he and Souvannarath discussed getting rid of the gun and that he saw Souvannarath walk towards the pond.

Amphaphone Phetphrachanh, Souvannarath's cousin, testified that several days after the shooting he stopped by Souvannarath's apartment to see him. Phetphrachanh had seen media coverage of the shooting and suspected that Souvannarath might be involved. Souvannarath, Hesston, Ho, and Bing were in the apartment when he arrived. Phetphrachanh testified that, as Souvannarath sat nearby, Ho and Hesston admitted that they were involved in the shooting. They also told Phetphrachanh that they had thrown the gun in the pond at Meadowland Park.

On March 30, 1995, the jury returned guilty verdicts on all counts against Souvannarath. He now claims that the judge instructed the jury incorrectly and that there was insufficient evidence to support the verdict.

Souvannarath first argues that his federal and state due process rights were violated by the trial court's jury instructions. He claims that the jury instructions created a presumption of premeditation and intent in favor of the state which shifted the state's burden of proof to the defendant at trial.

> The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. This * * * principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.

*Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985) (citations and quotation marks omitted). In pertinent part, the trial court gave the following jury instructions on criminal liability for crimes of another:

> It is the law that a person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with, or otherwise procures the other to commit the crime. In order to aid another to commit a crime, or aid and abet, as it is sometime known, it is necessary that the defendant voluntarily associate himself in some way with the criminal venture and voluntarily participate in it as he would in something he wishes to bring about—that is to say, that he voluntarily seek by some act or omission of his, to make the criminal venture succeed.
>
> If defendant intentionally aided another person in committing a crime, or intentionally advised, hired, counseled, conspired with, or otherwise procured the other person to commit it, defendant is also guilty of any other crime which that person commits while trying to commit the intended

crime, if that other crime was reasonably foreseeable as a probable consequence of trying to commit the intended crime.

The court then instructed the jury on first-degree premeditated murder.

> The elements of murder in the first degree are: first, the death of Orlando Enrique Guevara must be proven. Second, *another, aided and abetted by defendant,* caused the death of Orlando Enrique Guevara. Third, defendant *or another, aided and abetted by defendant,* acted with premeditation and with intent to kill Orlando Enrique Guevara or another person. Premeditation means that defendant *or another, aided and abetted by defendant,* considered, planned, prepared for, or determined to commit the act before it was committed. * * * In order to have had an intent to kill, defendant *or another, aided and abetted by defendant,* must have acted with the purpose of causing death or must have believed that the act would have that result. Fourth, the act took place on April 17, 1994, in Hennepin County.

(Emphasis added.) Similar "aiding and abetting" language was included in the instruction on attempted first-degree murder.

■ Souvannarath's argument is that the trial court's instruction relieved the prosecution of the burden of proving that he both premeditated and specifically intended the death of the victim. This argument, however, is fundamentally flawed. Section 609.05 requires only that the defendant "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." The trial court's instructions required that to find Souvannarath guilty of first-degree murder, the jury had to find that he acted with this intent. Thus, we hold that the jury instructions did not relieve the state of any part of its burden of proof and, therefore, did not violate Souvannarath's due process rights.

Souvannarath next claims the only evidence that he intended to kill someone was that he was driving the car and set a gun between Son Dac Ho and himself. He argues that this evidence is not sufficient to

convict him as an aider and abetter to first-degree murder.

In a sufficiency of the evidence challenge, "[i]f the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, the court will not disturb its verdict." The court will examine the evidence by viewing it in the light most favorable to the verdict * * *.

State v. Daniels, 361 N.W.2d 819, 826 (Minn. 1985) (citations omitted) (citing State v. McCullum, 289 N.W.2d 89, 91 (Minn.1979)).

■ "[P]resence, companionship, and conduct before and after the offense are circumstances from which a person's participation in the criminal intent may be inferred." State v. Ulvinen, 313 N.W.2d 425, 428 (Minn. 1981). Further, "[w]here the accused plays at least some knowing role in the commission of the crime and takes no steps to thwart its completion, the jury may properly infer the requisite mens rea for a conviction of aiding and abetting." State v. Strimling, 265 N.W.2d 423, 429 (Minn.1978).

To support his claim of insufficient evidence, appellant cites Ulvinen. While Ulvinen did hold that passive acquiescence, or "mere inaction" on the part of the defendant were insufficient to impose liability for the crimes of another, the case is entirely distinguishable. In Ulvinen, after strangling his wife, Ulvinen's son called Ulvinen up from the basement to watch the children while he dismembered his victim. Id. at 428. Ulvinen's son also had her help him clean up the bathroom after he had disposed of the body. Id. at 428. Finally, she corroborated her son's story to assist him in covering up for the murder. Id.

■ The current case, obviously, is factually entirely different. Further, Souvannarath was much more than just passively acquiescent. There was testimony that after the altercation with the El Salvadorans, Souvannarath asked Hesston "do you want to get the gun?" When the Asians returned to his apartment, Souvannarath went to his room and retrieved a pistol. He drove Hes-ston, the shooter, to the soccer field and there was testimony that it was "pretty obvious" that the three Asians were going back to the field to shoot the El Salvadorans. As they approached the field, Hesston, who had the gun in his hand and had said he was going to shoot, asked Souvannarath to slow the car and he complied. After the shooting, Souvannarath disposed of the murder weapon by throwing it into the pond at Meadowbrook Park. From this evidence, the jury could reasonably have concluded that Souvannarath was guilty of the offense charged. Thus, we hold that there is sufficient evidence in this case to convict him of aiding and abetting first-degree murder under section 609.05.

Souvannarath's brief might also be read to challenge the sufficiency of the testimony corroborating that of co-defendant Son Dac Ho.

■ Regarding testimony of a co-defendant, "[a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense * * *." Minn.Stat. § 634.04 (1994). However, it is not necessary that evidence corroborating accomplice testimony "establish a prima facie case of the defendant's guilt." State v. Adams, 295 N.W.2d 527, 533 (Minn.1980) (citation omitted). Such evidence "is sufficient if it restores confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial degree." State v. Houle, 257 N.W.2d 320, 324 (Minn.1977).

A review of the record reveals that the evidence corroborating Son Dac Ho's testimony met these standards. Thus, we hold that there was sufficient evidence corroborating the testimony of co-defendant Son Dac Ho to allow the guilty verdict to stand.

Affirmed.