**STATE of Minnesota, Respondent,**

v.

**Violet Jean JOHNSON, Appellant.**

**No. C1–89–21.**

Supreme Court of Minnesota.

Jan. 5, 1990.

C. Paul Jones, State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Thomas L. Johnson, Hennepin County Atty., Beverly J. Wolfe, Asst. County Atty., Minneapolis, for respondent.

WAHL, Justice.

Defendant Violet Jean Johnson was convicted by jury verdict on October 14, 1988 of first degree murder in violation of Minn. Stat. §§ 609.185, subd. 1[1], and 609.05, subd. 1[2], (1988) for intentionally aiding, advising, hiring, counseling or conspiring with her husband, Lawrence Johnson (Larry), in the premeditated killing of her brother, Norman Gonderman, Jr. (Junior). Junior, who was borderline mentally retarded, was 21 years old at the time he was shot to death. The sole issue on appeal is whether the evidence is sufficient to prove beyond a reasonable doubt that defendant

---

1. Minn.Stat. § 609.185, subd. 1 provides: "Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life * * * causes the death of a human being with premeditation and with intent to effect the death of the person * * *."

2. Minn.Stat. § 609.05, subd. 1, provides: "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."

intentionally aided and conspired with another in committing premeditated murder in the first degree. We find the evidence sufficient and affirm the conviction.

Junior Gonderman lived in Glyndon, Minnesota with his parents, Wanita and Norman Gonderman, Sr., and worked in his father's junkyard. He received a $350 social security check monthly, most of which went to his parents for living expenses. His sister Violet, defendant here, lived in North Minneapolis with her husband Larry and two young sons, Billy and Joey. Two other sisters, Danita and Patricia, lived in the Glyndon area. Defendant testified that she and her siblings suffered physical abuse at the hands of their father while growing up in the family home. Because of this earlier abuse she herself had been removed from the home and placed in foster homes. After she left home, defendant eventually came to the Twin Cities and got a job at Fisher Texaco service station on Hennepin Avenue where she pumped gas, worked as a bookkeeper and cashier, and worked on cars with the mechanics. She met and married Larry Johnson, who began to remind her of her father when he lost his temper and yelled at her. Defendant quit her job before Joey was born to be home with her children but continued to work on cars in her garage.

The Johnsons began an insurance program in 1986 when their first son was born. At that time they purchased a $129,000 policy on Billy and $100,000 on each other. They also purchased a $125,000 policy on their second son when he was born. These policies, all universal life rather than term policies, had total monthly premiums of $183.30.

The defendant testified that in early January 1988, her brother called and asked if he could come to Minneapolis to live with her. She thought Junior needed to get away from home. Sometimes he had lived with Danita when he and his father were not getting along. Defendant wired Junior a bus ticket so he could move in with her and Larry and the children. At the time Junior moved in with them, the Johnsons were in financial trouble. Defendant testified she was bothered because Larry spent money irresponsibly, charging to the limit on his credit cards and making delayed payments on bills. As of January 1988, the couple owed $8530 in bills and had only $1470 in savings. They were behind in payments on their utility bills and Larry's car had been repossessed. In March 1988, two months after Junior's arrival, Larry quit his job. To defendant's frustration, her parents refused to forward Junior's monthly social security checks to the Johnsons.

On February 26, 1988, the Johnsons, Junior, and Larry's mother, Barbara Iverslie, met with the Johnsons' insurance agent, Ronald Bolanda. The Johnsons purchased a $56,000 universal life insurance policy on Junior. Defendant owned the policy and was named as primary beneficiary. The policy named Billy as secondary beneficiary. The Johnsons also purchased a $25,000 universal life insurance policy on Iverslie. Defendant owned the policy and was named as secondary beneficiary. Larry was the primary beneficiary of his mother's policy. Defendant wrote a check for the initial premiums for both policies. She authorized future automatic payments of the premiums from the Johnsons' checking account. The premium payments were $25.00 and $40.00 per month for the respective policies. The policies became effective on April 14, 1988 when the agent delivered them to defendant.

Since Junior was not working, defendant worked out a barter system where Junior would babysit for Billy and Joey while defendant worked on cars in her garage. One day in March 1988, defendant walked into the house and found Junior fondling two-year-old Billy. Defendant was angry and threw Junior against the wall. Defendant then made arrangements for some friends to babysit for the children. The babysitter told defendant that Billy complained, "Junior hurt down there. Junior hurt butt." Defendant took Billy to the hospital. A medical exam and laboratory tests indicated no injuries or diseases except for diaper rash and an eye infection. The hospital, as required by law, filed a

report of suspected sexual abuse with the police.

Larry first learned that Junior had sexually molested his son on March 23. Larry threatened, in defendant's presence, to hurt Junior because of the sexual abuse. Larry threw Junior out of the house, and Junior moved in with Greg Holland, who also lived in North Minneapolis. Holland was a friend of Junior's older sister Danita.

Despite their financial difficulties, the Johnsons wanted to purchase a mechanic's business in Rockville, Minnesota, Larry's hometown. They went to Rockville on April 4. The owner was asking $100,000 for the business and the Johnsons would need $60,000 for a down payment. On the way home from Rockville, Larry told defendant, "too bad something can't happen to Junior that I'm not involved with."

Larry made other threats to harm Junior in defendant's presence. On April 2, Larry threatened to hurt Junior while he was sleeping outside in a school bus. Larry also told defendant he intended to drop a race car on Junior while the two of them were working in the garage. When Larry said he wanted to shoot Junior in bed, defendant told him, "No, not in this house." Defendant testified she did not think her husband would carry out any of his threats because he did not have the guts and because, even though Larry had a temper, she had never seen him act violently towards anyone.

There was evidence introduced at trial that defendant attempted to purchase a gun on two occasions. Defendant asked an acquaintance, Donny Meyer, if he knew anyone who had a gun for sale. She wanted to buy an unregistered weapon. On April 4, defendant told another acquaintance, Bernard "Stretch" Burczyk, that she needed a gun. Defendant spent three days with Burczyk on a wild goose chase around the Twin Cities trying to buy a gun. She spent two nights sleeping in her car waiting for a friend of Burczyk to deliver the gun. Defendant finally gave up the pursuit when Burczyk told her to forget about the gun. Defendant had given Burczyk $128 and bought him some new clothes.

Junior called his family sometime in April and told them he wanted to go home. Danita called the Johnsons on April 14 and told Larry she would be down the next day to get Junior. Defendant went to Holland's house about 11:00 that night and pounded on the door. Defendant told Holland that her parents were coming the next morning. She said her brother owed Larry some money and Larry wanted Junior to help out with some work before the Gondermans arrived. Holland gave Junior the message about his parents when Junior came home a short time later. Junior seemed pretty excited and packed his belongings.

Larry answered the door when Wanita and Danita arrived on April 15. Larry told Wanita that he did not know where Junior was, but if Junior came around, Larry would blow off his head because Junior had molested Billy. Danita was frightened. "When he told me he was going to kill my brother, * * * he looked like the devil himself. His eyes were black and he meant what he said and I tried finding my brother." The Gondermans drove around Minneapolis looking for Junior, but went home without him the next morning.

Junior spent Sunday, April 17, with the Johnsons. A neighbor saw him with them Sunday afternoon. Sunday evening Larry and Junior were seen together at a bowling alley. On the morning of April 18, a passerby found Junior's body in an industrial area near downtown. He had been killed by two shotgun blasts to the head and chest fired at a range of two feet or less. When the police went to the Johnson home and told the Johnsons they had found a body that might be Junior's, defendant gave the police a photograph of her brother. She also showed them the sexual abuse police report. Defendant remained silent when Larry told the police he did not own a shotgun, even though she knew he did.

Defendant and her husband drove to Iverslie's home in St. Cloud that afternoon. Larry threw shotgun shells out the window along the way and left his shotgun with his mother. Police arrested Larry the follow-

ing day based on information provided by Danita. Defendant was cooperative with the police at this time, informing them of Larry's disposal of the gun and taking them along the route where he had tossed the shotgun shells.

Several days later, defendant confessed to Iverslie that she and Larry planned to kill Junior as early as April 10. Defendant told Iverslie of her attempt to buy a gun from Stretch Burczyk. Iverslie, fearing for her own safety, contacted the police and gave them a formal statement.

Defendant was again cooperative with the police when she gave them the insurance policies Iverslie had told them about. Sergeant Nelson, who had been involved in the investigation from its onset, told defendant about Iverslie's statement. Defendant admitted that what she had told Iverslie was true. Nelson arrested defendant and went through Iverslie's statement with her in detail at the police station. Defendant confirmed that most of Iverslie's statement was accurate. Defendant was found guilty as charged and sentenced to life imprisonment. This appeal followed.

The standard of review of a jury conviction in a sufficiency of the evidence challenge is whether, viewing the evidence in the light most favorable to the verdict, the jury could reasonably conclude the defendant was guilty beyond a reasonable doubt. *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988). We must view the evidence in the light most favorable to the state and assume the jury believed the state's evidence and disbelieved conflicting evidence. *Id.* We make a painstaking review of the evidence when such a challenge is raised. *State v. Ellingson*, 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969).

Defendant was charged with intentionally aiding, advising, counseling or conspiring with her husband Larry Johnson to commit the crime of premeditated murder in the first degree. The prosecution argued at trial that defendant conspired with her husband to purchase a life insurance policy on her brother's life and then to kill him in order to collect the proceeds.

Defendant argued that although the evidence may have shown she was foolish, it did not prove beyond a reasonable doubt that she was actively involved in a plan to take Junior into a deserted industrial area and shoot him with a shotgun. Further, though the evidence may have shown defendant did not actively dissuade her husband from carrying out his threats, it did not prove beyond a reasonable doubt that she encouraged him to do what he might not otherwise have done. Defendant argues that, like David Hoffman's mother in *State v. Ulvinen*, 313 N.W.2d 425 (Minn. 1981), she was only passively acquiescent, not criminally liable, in her brother's death.

This is not the *Ulvinen* case. As the state noted in oral argument, in *Ulvinen*, David Hoffman repeatedly told many people, not just his mother, that he was going to kill his wife. Further, all other steps taken by Hoffman's mother were taken *after* the murder. In this case, defendant's actions before the actual murder show that she actively and intentionally assisted her husband in planning her brother's death.

The statute providing for liability for the crime of another may seem unreasonably harsh in some cases. In this case, however, the evidence—the defendant's confession to planning the murder with her husband, her two attempts to buy a gun, and her purchase of a policy of insurance on her brother's life naming her as the primary beneficiary shortly before her brother's death—is sufficient to prove beyond a reasonable doubt that defendant intentionally aided, advised, counseled or conspired with another in premeditated murder in the first degree. We so hold and affirm the conviction.

Affirmed.