STATE of Minnesota, Respondent,

v.

Francisco DOMINGUEZ–RAMIREZ,
Appellant.

No. C6–96–907.

Supreme Court of Minnesota.

May 15, 1997.

John M. Stuart, Minnesota State Public Defender, Sharon E. Jacks, Assistant State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, St. Paul, James C. Backstrom, Dakota County Attorney, Phillip D. Prokopowicz, Assistant Dakota County Attorney, Hastings, for Respondent.

## OPINION

ANDERSON, Justice.

On April 24, 1995, Hector Vasquez was found shot to death in West St. Paul, Minnesota. A complaint and warrant were issued for the arrest of appellant Francisco Dominguez–Ramirez, charging him with aiding and abetting Vasquez's murder. Ramirez was arrested in Kansas for Vasquez's murder on July 7, 1995. While in Kansas, Ramirez made an incriminating statement to police in response to custodial interrogation. Prior to trial, Ramirez moved to suppress this statement. The district court denied Ramirez's motion and admitted the statement at trial. A jury found Ramirez guilty of one count of aiding and abetting first-degree murder and three counts of aiding and abetting second-degree murder. The court sentenced him to life imprisonment on the charge of aiding and abetting first-degree murder. Ramirez appeals his conviction, arguing that he did not validly waive his rights against self-incrimination, that his statement was involuntary, and that there is insufficient evidence to sustain the jury's verdict. We affirm.

On April 24, 1995, at about 5:30 p.m., Danny Dugger was working in his garage when he heard a gunshot coming from inside a nearby house located at 246 East Annapolis in West St. Paul. Dugger's 14–year–old son Brandon was in the backyard and heard the same gunshot. Dugger and Brandon agreed that, shortly after the gunshot, two Hispanic men left 246 East Annapolis through the back door and appeared to have trouble closing the door. Brandon believed that the shorter man appeared to be trying to push something inside the door. Brandon had seen the shorter man at 246 East Annapolis on three or four prior occasions. Dugger and Brandon agreed that the two men walked down the sidewalk, got into a gold Malibu, and drove away down the alley. Dugger and Brandon had seen the Malibu at the house on several occasions prior to the shooting. Dugger is employed selling used cars and he gave detailed testimony describing the Malibu.

Dugger called 911 immediately using a portable phone. He then watched the house at 246 East Annapolis until the police came and did not see anyone else come out of the house or see any other vehicles leave the area. Brandon subsequently identified Ramirez from a photographic lineup as the shorter man who was attempting to push something inside the door and as the driver of the Malibu. Brandon was unable to identify Ramirez at trial; he testified that Ramirez "look[ed] to be" about the same as the shorter man, but he was not sure.

Also at about 5:30 p.m., another neighbor, Arlin Bohn, heard "what sounded like bangs" coming from the back of his home and heard another noise shortly thereafter. Bohn looked out a window and saw two Hispanic men walk down the sidewalk in back of 246 East Annapolis, get into a light brown or tan car, and leave. Bohn agreed with Dugger and Brandon that one of the men was taller than the other and agreed with Dugger that the taller man walked in front of the shorter man. He also agreed with Brandon that the shorter man drove the car.

Officers of the West St. Paul Police Department arrived within minutes after the gunshots. While one officer went around to the front of 246 East Annapolis, a second police officer approached from the rear and noticed a fresh trail of blood from the back door of the house to the alley, including a bloody smear on the back door and bloody shoeprints. The word "Reebok" was clearly imprinted in the treadprint on the sidewalk. Additional officers arrived within minutes, and when the officers opened the back door, they saw Vasquez lying on the floor with a large pool of blood near his head. There was a revolver lying on his body. Vasquez had

been shot five times—the cause of death was a gunshot to his head. Police noticed what appeared to be vomit on Vasquez's pants leg. When the police entered, no one else was in the house and the front door was locked.

The Minnesota Bureau of Criminal Apprehension (BCA) determined that the revolver found on the body was the murder weapon, that five bullets had been fired, that the bullets recovered from Vasquez and the crime scene were all fired from the revolver, that the serial number had been scratched off the revolver, and that the revolver contained the fingerprint of Alonso Chavez. There was a bloody shoeprint on Vasquez's shirt. The BCA also discovered blood in the hallway of the residence, on the floor atop the basement stairs, and near the body inside the back door. No blood was found in the other rooms on the main floor. There were blood spatters on the exterior of the back door, but no blood spatters on the interior. A forensic scientist for the BCA testified that the blood spatters included a "contact pattern" where a bloody object came into contact with the door. As a result of the blood spatter evidence, the forensic scientist opined that the door was open when the blood was shed.

One of the bullets found at the scene was lodged in the stairway panelling, at the top of the stairs, just inside the basement door. Another bullet was lodged in the ceiling. Although the forensic expert said he could not be certain, he testified that this second bullet appeared to have been fired from the basement stairway. Based upon the location of these two bullets, the forensic scientist opined that one or two shots had been fired from the basement, towards the stairs.

As a result of an investigation involving officers from several police departments, the police believed that a group of Hispanic men staying at the Boyd Motel in Newport, Minnesota may have been involved in Vasquez's murder and that Ramirez was a possible suspect. The manager of the motel told a police officer that a group of four to six Hispanic men had been staying in a room at the motel. The registration card for the room listed the license number of the occu-

pants' vehicle, and the manager remembered that the vehicle was a black Ford Taurus station wagon. The police subsequently learned that the black Taurus belonged to Chavez. The manager identified Ramirez from a photographic lineup and at trial as one of the men he had seen in or around the motel room. The manager testified that he saw Ramirez at the motel about five to ten times—the last time being on April 25 or 26, 1995. The manager also identified Chavez from another photographic lineup and said that he saw Chavez and Ramirez together in and around the motel room. It is not clear when the manager saw Chavez and Ramirez together, but the room had been rented to the group of men from April 14 to 25, 1995.

Ramirez came to the United States in the fall of 1994, when he was 18 years old. Ramirez is a Mexican citizen who speaks very little English. After spending about a week in Kansas, he moved to Minnesota to live with his cousin at 246 East Annapolis. A few days after Ramirez arrived in Minnesota, he and his cousin moved to another residence, but Ramirez subsequently returned to 246 East Annapolis. His cousin continued to pay rent on 246 East Annapolis and Ramirez was expected to clean it. Ramirez had a key to 246 East Annapolis in April 1995.

On May 10, 1995, a complaint and warrant were issued for the arrest of Ramirez, charging him with aiding and abetting murder in the second degree.[1] Ramirez was arrested on July 7, 1995, in Liberal, Kansas. Jesus Martinez, a Spanish-speaking Liberal police officer, administered a *Miranda* warning to Ramirez at about 1:20 a.m., at the scene of his arrest. Martinez administered a second warning to Ramirez at the police station. Martinez read each *Miranda* warning verbatim from a card that contained a Spanish version of the warning. After the second warning, Ramirez signed a form containing a Spanish version of the *Miranda* warning. Martinez did not take a statement from Ramirez.

The Kansas authorities contacted the Minnesota authorities the day that Ramirez was arrested. Steven Hanson, a sergeant

---

1. Chavez was indicted for Vasquez's murder, but he fled to Mexico and has not been tried.

with the West St. Paul Police, and Eugene Leatherman, a special agent with the BCA, flew to Kansas that same day. Hanson and Leatherman knew before the interview that Ramirez did not speak English. Neither Hanson nor Leatherman understands more than a word or phrase of Spanish.

The Kansas police agreed to provide an interpreter for the interrogation of Ramirez. Alejo Lagunas, a Spanish-speaking Liberal police officer, was summoned to the police station to serve as an interpreter. Lagunas had not been involved in the investigation and was told only that some Minnesota officers were working on a homicide case and needed an interpreter. Lagunas informed Ramirez that he was a police officer.

Leatherman began the interrogation by confirming that Ramirez had already been advised of his rights. Then, with Lagunas interpreting, Hanson and Leatherman informed Ramirez that they were police officers from Minnesota and asked Lagunas to read Ramirez his rights. Lagunas read Ramirez his *Miranda* rights from a card written in English, with Lagunas interpreting into Spanish as he read. Lagunas read Ramirez the following rights:

> Lagunas: (to Ramirez in Spanish): You have a right not to say nothing . . . you
>
> Leatherman: Does he understand that? Ask him . . .
>
> Lagunas: (in Spanish): Do you understand what I'm saying to you?
>
> Ramirez: Um-hm.
>
> Lagunas: Si. (in Spanish): Tell him you need to talk because it's taped.
>
> Ramirez: Um-hm.
>
> Lagunas: (in Spanish): Say yes or no.

> Leatherman: And tell him the reason we want to tape record it is to protect him and us, so that we don't say something that he didn't say.
>
> Lagunas: (in Spanish): That we need to tape this for, to, guard your rights . . . of yours and ours.
>
> Ramirez: Si.
>
> Lagunas: (in Spanish): And what you say can be used against your (sic) in a court of law. You have a right to speak with a lawyer or have him present when they are asking you questions and if you don't have enough to hire an attorney an attorney . . . of . . . the . . . they can give you an attorney . . . to be present. Do you understand your rights?
>
> Ramirez: Si. Yes.
>
> Lagunas: (in Spanish): Having all of these rights in mind . . . we, do you want to talk with us?
>
> Ramirez: (in Spanish): Yes.

With Lagunas interpreting, Leatherman informed Ramirez of the charges against him. Hanson and Leatherman asked questions, with Lagunas interpreting from English to Spanish for Ramirez and from Spanish to English for Hanson and Leatherman. Ramirez then answered Hanson's and Leatherman's questions for approximately four hours.

 The entire interrogation was tape recorded and transcribed by the police. Loida Montemayor, an investigator with the public defender's office who speaks Spanish and has served as a Spanish–English interpreter, listened to the tape recording, translated the Spanish portions, and made corrections to the transcript provided by the police. A copy of the transcript, as corrected by Montemayor, was admitted into evidence.[2]

2. A copy of the interrogation transcript, as corrected by Montemayor, was admitted at trial and a copy was given to each juror. While it may be appropriate for a district court to furnish jurors with copies of a transcript to assist them when a tape recording is played, ordinarily a transcript should not be admitted in evidence unless both parties stipulate to its accuracy and admission. *State v. Swanson*, 498 N.W.2d 435, 439 (Minn. 1993) (following *State v. Olkon*, 299 N.W.2d 89, 103 (Minn.1980)).

At trial, Ramirez argued that the corrected transcript was accurate and, citing *Swanson*, argued that a copy should be given to jurors to use while listening to the tape recording. The state and Ramirez stipulated that a copy of the corrected transcript would go into the jury room and that each juror would have a copy to use while the tape was played. The judge told jurors to treat their copy of the corrected transcript as part of their notes and to take it into the jury room during deliberations. Ramirez did not object.

Ramirez now contends that the district court erred in admitting the corrected transcript of his interrogation because it contained inaccuracies

Ramirez's statement to the police consists of this corrected transcript.

In his statement to the police, Ramirez admitted that he was at 246 East Annapolis at the time of the murder. He stated that he had called Vasquez at Chavez's request and told Vasquez to meet Chavez at 246 East Annapolis, that he arrived at 246 East Annapolis about the time of the murder, that he stepped inside the door, that he heard Chavez and Vasquez talking, that he heard two shots, that he saw Vasquez approach him with blood on him, that he vomited, and that he went to Kansas the next day. He denied going to or from 246 East Annapolis with Chavez, witnessing the shooting, and knowing that Chavez intended to harm Vasquez.

The Dakota County grand jury indicted Ramirez on charges of murder and aiding and abetting murder. Ramirez had a jury trial on one charge of aiding and abetting first-degree murder and three counts of aiding and abetting second-degree murder.

At trial, Vasquez's girlfriend testified that Vasquez received a telephone call at their home on April 24, 1995, at about 4:45 p.m. She testified that, after the call, Vasquez appeared worried and, at about 5:00 p.m., drove off in her car. The drive from Vasquez's home to 246 East Annapolis takes about 10 to 15 minutes.

In his testimony at trial, Ramirez admitted that he had been living at 246 East Annapolis. Ramirez also admitted that the Malibu was the car he drove every day. He admitted that he was present at 246 East Annapolis at the time of the murder, but denied having driven with Chavez either to or from the scene of the murder. He testified that he spent the night before the murder at the Boyd Motel. Ramirez testified that on the day of the murder he borrowed his cousin's white Cadillac without her permission and drove to 246 East Annapolis. He explained that he borrowed the Cadillac because Chavez had borrowed his Malibu.

Contrary to his earlier statement to the police, at trial, Ramirez denied setting up the meeting between Chavez and Vasquez. He testified that he did not know about the meeting, and did not know anyone would be present, but just went to 246 East Annapolis to "go there to do something." Ramirez testified that he parked the Cadillac in back, where he noticed his Malibu was already parked. He approached the residence, heard voices, unlocked the door, stepped just inside the door, heard Chavez demanding money, heard Vasquez's voice, heard two gunshots, saw Vasquez approach with blood on his hands, vomited, and left in the Cadillac. He testified that he did not see Vasquez fall and that Vasquez was not on the floor when he vomited. He testified that he went outside and pulled the back door towards him, leaving it a "little bit closed." He testified that although he heard Chavez's voice, he never saw Chavez at the residence and never saw him again.

Ramirez testified that he then drove to his cousin's house to return the Cadillac because he was afraid she would be mad that he had borrowed it, walked a couple of blocks from her home, then took a cab to the Boyd Motel. Ramirez testified that he went to the motel believing that Chavez would be there, but was not worried because he did not believe Chavez had seen him at 246 East Annapolis. Ramirez testified that, shortly after arriving at the motel, his cousin's husband told him to leave town and lent him a car.

A jury found Ramirez guilty of four counts of aiding and abetting Vasquez's murder and the district court sentenced him to life imprisonment for aiding and abetting first-degree murder. See Minn.Stat. §§ 609.185(1); 609.05 (1996). Ramirez appeals his conviction on four grounds: (1) the district court erred in admitting his statement because he did not validly waive his right against self-incrimination; (2) the district court erred in admitting his statement because it was involuntary; (3) this court should use its supervi-

and because both parties did not stipulate to its admission. Generally, "[f]ailure to object at trial will act as a bar to objecting on appeal." *State v. Peterson*, 533 N.W.2d 87, 91 (Minn.App.1995). But a defendant may still obtain appellate review, even though the defendant failed to object

at trial, if the error was a "plain error affecting substantial rights" and if "the error had the effect of denying the defendant a fair trial." *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn. 1996). Ramirez has not met the plain error standard in this case.

sory power and reverse his conviction to enforce the use of independent qualified interpreters; and (4) there is insufficient evidence to sustain the jury's verdict.

## I.

We first address Ramirez's contention that his statement was erroneously admitted because he did not validly waive his right against self-incrimination. The district court found that Ramirez "knowingly and intelligently waived his right against self-incrimination."

■ Before a statement taken from a defendant during custodial interrogation can be admitted at trial, the state must prove: (1) that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights, and (2) that the defendant gave his statement voluntarily. *State v. Williams*, 535 N.W.2d 277, 286 (Minn.1995). The two requirements serve different purposes. The first requirement ensures that the defendant was aware of his right to remain silent. *State v. Merrill*, 274 N.W.2d 99, 106 (Minn.1978). The second requirement protects the trustworthiness of the defendant's statement by ensuring that he was not coerced into giving an involuntary confession. *See id.* at 106 n. 4.

■ The state has the burden of proving that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *Williams*, 535 N.W.2d at 286. Ordinarily, the state is deemed to have met its burden if it shows that the defendant was fully advised of his *Miranda* rights, indicated he understood his rights, and gave a statement. *Id.* On appeal, this court will independently determine, on the basis of the facts as found by the district court, whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). We will not reverse the district court's findings unless they are clearly erroneous. *Id.*

■ Ramirez contends that he did not validly waive his *Miranda* rights because Officer Martinez, who administered the first two *Miranda* warnings, told Ramirez that the rights belonged to United States citizens,

thus Ramirez had no reason to believe the rights pertained to him. Ramirez cites Martinez's testimony at the Rasmussen hearing in support of his assertion.

Martinez testified that he read Ramirez the complete *Miranda* warning twice from a card containing a Spanish-language version of the warning and showed Ramirez a written Spanish-language version which Ramirez signed. There is no dispute that each of the *Miranda* warnings Martinez read to Ramirez was complete and accurate. Martinez testified that, on each occasion, after he read Ramirez the warning, he explained parts of the warning. On each occasion, as part of his explanation, Martinez advised Ramirez that he had the *Miranda* rights as a United States citizen, not that the rights were *only* for citizens. Martinez's statements to Ramirez suggest that he believed the *Miranda* rights applied to Ramirez. Although Ramirez did not speak English, there is no evidence that Martinez knew Ramirez was not a United States citizen or that Martinez intentionally tried to mislead or confuse him. When Ramirez asked a question about the right to talk to an attorney, Martinez advised Ramirez that he had the right to an attorney. The written Spanish-language version of the *Miranda* warning that Ramirez signed informed Ramirez that the rights belonged to him and did not mention that the rights belonged to United States citizens.

■ Ramirez also contends that he did not validly waive his *Miranda* rights because Officer Lagunas, who administered the third *Miranda* warning, misinterpreted the warning. Ramirez cites the corrected transcript of the interrogation to support this contention. Lagunas, who administered the third warning, interpreted the *Miranda* rights from English to Spanish. The rights Lagunas read were not an exact interpretation of the *Miranda* rights. However, the rights Lagunas read were substantially similar to the required warning. Lagunas's interpretation informed Ramirez that he had the rights at the time of interrogation and did not imply that appointment of an attorney would occur at a future date. The *Miranda* warning need not take a rigid form so long as the warning is correct in substance. *State v.*

*Ouk,* 516 N.W.2d 180, 185 (Minn.1994) (citing *California v. Prysock,* 453 U.S. 355, 359–61, 101 S.Ct. 2806, 2809–10, 69 L.Ed.2d 696 (1981)). While it would have been preferable for Lagunas to read the rights verbatim from a Spanish-language version of the *Miranda* warning, we conclude that the rights Lagunas read to Ramirez were sufficient to satisfy the *Miranda* requirements.

Police officers read Ramirez his *Miranda* rights in Spanish three times and showed him a *Miranda* warning written in Spanish. After Martinez read the first *Miranda* warning to Ramirez and asked Ramirez if he understood his rights under *Miranda,* Ramirez replied that he understood. After Martinez read Ramirez the second *Miranda* warning and showed the written warning to Ramirez, he signed the written version. When Lagunas read Ramirez his *Miranda* rights a third time, immediately before the interrogation began, Lagunas asked Ramirez if he understood his rights. Ramirez answered, "Si, Yes." When Lagunas asked if Ramirez wanted to talk to the officers, Ramirez replied, "Yes." At no point, either before or during the interrogation, did Ramirez say anything to indicate that he did not understand his rights or to indicate that he wished to invoke his rights. Ramirez responded to the officers' questions without hesitation for about four hours. Based upon these facts and circumstances, we conclude that the district court did not err in its determination that Ramirez waived his right against self-incrimination.

■ Ramirez further contends that the use of Lagunas as an interpreter violated Minn.Stat. §§ 611.30–.33 and that this violation prevented Ramirez from validly waiving his *Miranda* rights. The district court determined that any violations of the statutes did not warrant suppression of Ramirez's statement. Sections 611.30 to 611.33 mandate the appointment of an independent qual-

ified interpreter when police interrogate a non-English speaking person.[3] Minn.Stat. §§ 611.30–.33 (1996). Hanson and Leatherman clearly violated Minn.Stat. §§ 611.30–.33 by using a police officer as an interpreter and by failing to have the interpreter take an oath. *See* Minn.Stat. § 611.32; *State v. Mitjans,* 408 N.W.2d 824, 830 (Minn.1987).

In *State v. Mitjans,* this court noted that the legislature did not attempt to create any new constitutional rights in enacting Minn. Stat. §§ 611.30–.33. *Mitjans,* 408 N.W.2d at 830. Rather, the legislature intended to protect existing constitutional rights. *Id.* We held that the issue of the admissibility of a defendant's statement is "a quintessentially judicial issue," for which this court, rather than the legislature, has the primary responsibility. *Id.*

■ Because Minn.Stat. §§ 611.30–.33 do not create any new constitutional rights, violation of the statutes does not mandate suppression of a defendant's statement. *Id.* Although Hanson and Leatherman violated the statutes by using a police officer as an interpreter and by failing to have the interpreter take an oath, and although it can be argued that Lagunas was not sufficiently fluent to otherwise meet the statutory requirements for a qualified interpreter, these deficiencies are not sufficient to render Ramirez's statement inadmissible under *Mitjans.* In determining whether a defendant's statement should be suppressed, the issue is whether the defendant validly waived his constitutional rights, not whether the statutes were violated. Having previously concluded that the district court did not err in determining that Ramirez waived his right against self-incrimination, any violations of Minn.Stat. §§ 611.30–.33 do not mandate suppression of Ramirez's statement.

The evidence supports the district court's finding that Ramirez "knowingly and intelligently waived his right against self-incrimi-

3. Minnesota has declared a policy that the constitutional rights of persons who have difficulty in comprehending English "cannot be fully protected unless qualified interpreters are available to assist them in legal proceedings." Minn.Stat. §§ 611.30–.31. Following a defendant's arrest, the arresting officer shall obtain a qualified interpreter and explain to the defendant, with the

assistance of the interpreter, the charges against him. Minn.Stat. § 611.32, subd. 2. A qualified interpreter must be readily able to communicate with the defendant, must interpret and accurately repeat statements, must take an oath, and must not disclose any privileged information. Minn.Stat. § 611.33.

nation" and the court's determination that any violations of Minn.Stat. §§ 611.31–.33 did not warrant suppression of Ramirez's statement. Accordingly, we hold that the court did not err when it determined that Ramirez waived his right against self-incrimination.

## II.

We next consider Ramirez's claim that his statement was involuntary in light of Lagunas's alleged incompetency to interpret and the conduct of the police officers during the interrogation. The district court found that there was no evidence that the police used an interrogation technique that was unduly coercive, deceptive, or stress-inducing, and that Ramirez's statement was "freely and voluntarily given" under the totality of the circumstances.

■■■■ "A defendant is deprived of due process of law under the Fourteenth Amendment when the defendant's conviction is founded upon an involuntary confession." *State v. Camacho,* 561 N.W.2d 160, 169 (Minn.1997). If the totality of the circumstances indicates that the defendant's will was overborne, his confession is involuntary. *Merrill,* 274 N.W.2d at 106–07. The factors to be considered include the defendant's age, maturity, intelligence, education, experience, ability to comprehend, lack or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, limits on access to an attorney and friends, familiarity with the criminal justice system, physical and mental condition, and language barriers. *Camacho,* 561 N.W.2d at 168 & 169. The police need not use threats or intimidating techniques for a court to find that the police exercised improper influence. *Merrill,* 274 N.W.2d at 107. On appeal, this court "independently determine[s] the voluntariness of the statement on the facts as found" by the district court. *State v. Robinson,* 427 N.W.2d 217, 222 (Minn.1988).

Ramirez contends that his statement was involuntary because Lagunas was incompetent to serve as an interpreter, Lagunas's incompetency caused the interrogation to be coercive, Lagunas was a police officer and thus was an interested party, and the police officers Hanson and Leatherman engaged in impermissible conduct during the interrogation. In support of his argument, Ramirez notes that he was 19 years old at the time of the interrogation, he had not completed high school, he had never studied in the United States, he had been in this country for less than one year, and his English was limited.

■■■■ Ramirez contends that his statement was involuntary because Lagunas's incompetence as an interpreter caused the interrogation to be coercive. At trial, when Ramirez was asked if he had difficulty understanding Lagunas, he replied, "a little." Ramirez testified that Lagunas spoke a different type of Spanish than Ramirez spoke. He testified, "It's very hard to understand him. Many of the things that he said are not clear. And he tries to give a different meaning."

Lagunas testified that his pronunciation of Spanish "is not as good as others" and that there are Spanish words he does not understand.[4] He also admitted that he sometimes has a hearing problem because he has not been able to hear in his right ear since birth. However, before the interrogation began, Hanson noticed Lagunas's ear deformity and this influenced the seating arrangement for the interrogation. Lagunas admitted that he had some difficulty in interpreting, but asserted that he and Ramirez were able to understand each other. Lagunas testified that whenever he had some difficulty in understanding either Ramirez or the officers, he attempted to stop or clarify what was being said.

Hanson testified that Lagunas was "the best person available" and that it appeared to him that Lagunas was providing interpretation to Ramirez because "there was a dialogue in Spanish going back and forth between Lagunas and Mr. Ramirez." Leatherman testified that he believed that Lagunas did not have difficulty interpreting,

---

4. Lagunas's parents are from Mexico, but he was born in Texas. Although Lagunas never received any formal instruction in Spanish, his parents spoke mostly Spanish. Lagunas testified that about 25 percent of the population of Liberal, Kansas is Hispanic and that he serves as an interpreter for other police officers at least once per day.

except that sometimes Leatherman would forget Lagunas was having to interpret and would interrupt Lagunas.

Ramirez also relies upon the testimony of Montemayor to show that Lagunas was incompetent to interpret. Montemayor listened to the tape recording of Ramirez's statement and made corrections to the transcript provided by the police. Based upon this corrected transcript, Montemayor testified that Lagunas made many errors, both in interpreting from English to Spanish and from Spanish to English. Montemayor testified that these errors often "greatly colored" what the officers thought Ramirez had said.

Because the entire interrogation was tape recorded and transcribed, we have the benefit of knowing Ramirez's responses and what Lagunas interpreted. The transcript, with Montemayor's corrections, demonstrates that Lagunas did make many errors in interpretation. Most of the errors occurred when Lagunas correctly interpreted the essence of Ramirez's responses, but in doing so paraphrased the responses. Other errors, however, were more serious, such as when Lagunas omitted a portion of Ramirez's responses, failed to interpret entire remarks, changed words or phrases, thereby changing meaning, and added information to fill in gaps in Ramirez's remarks. While these errors are unquestionably serious, a careful review of the transcript shows that these errors were few in number.[5]

The corrected transcript reveals that Lagunas had some difficulty in serving as a Spanish–English interpreter. While the interpretation difficulties certainly caused the interrogation to take longer, as questions were rephrased or repeated, there is no indication that these difficulties made the confession coercive. During the interrogation, Ramirez initially denied that he was present at

246 East Annapolis. He later admitted that he was present and that he set up the meeting with Vasquez and Chavez, but denied having been involved in Vasquez's murder. He then essentially stuck to his story. A review of the corrected transcript does not support Ramirez's allegations that Lagunas's shortcomings as an interpreter made the interrogation coercive.

■ Ramirez also asserts that his statement was involuntary because Lagunas was a police officer, rather than an independent interpreter, thus Ramirez's responses were "relayed to the officers by an individual interested in the case's outcome." The record does not support this argument. Lagunas had not been involved in this investigation before the interrogation occurred and had no knowledge of the facts of the case. Before the interrogation began, he informed Ramirez that he was a police officer, so Ramirez was not misled. Although he did not take an oath, Lagunas testified under oath at the Rasmussen hearing and at trial, and was subject to cross-examination. He testified that he interpreted "the best I could." The availability of the tape recording and transcript is critical to the outcome of this case. The transcript belies Ramirez's assertion that Lagunas's interest in the investigation altered the responses he interpreted. Although Lagunas made errors when interpreting, his errors do not favor the police and do not evince an interest in the case's outcome.

Ramirez also contends that Hanson and Leatherman's conduct during the interrogation made Ramirez's statement involuntary. However, the evidence does not establish the existence of impermissible police conduct. The interrogation took place in the library at the police station and lasted approximately four hours. Hanson testified that the inter-

---

5. The transcript of Ramirez's interrogation shows that, if anything, Lagunas's lack of fluency frustrated Hanson and Leatherman's attempt to elicit a more incriminating statement from Ramirez. For example, in interpreting the officers' questions, Lagunas failed to inform Ramirez that people had identified him from a photographic lineup, that he had been recognized at the Boyd Motel, and that more than one witness saw Ramirez close the door to the residence. In interpreting Ramirez's responses, Lagunas did not

inform the police that Ramirez admitted early in the interview that Chavez had killed Vasquez. He also failed to inform police that Ramirez admitted to having been at the Boyd Motel, admitted to hanging around with both Vasquez and Chavez, and stated that Chavez killed Vasquez because Vasquez owed Chavez money. If the police had known the full content of Ramirez's admissions, they may well have asked further questions on those points.

rogation lasted approximately four times longer than normal because he and Leatherman had to speak slowly and pause for interpretation. The questioning ended because everyone was tired. The only people present were Hanson, Leatherman, Lagunas, and Ramirez. Hanson and Lagunas testified that none of the officers threatened or attempted to coerce Ramirez. Hanson described the interview as casual. Leatherman testified that the atmosphere was very serious, but noted that Ramirez would sometimes smile or laugh. The transcript of the interrogation confirms the officers' testimony and supports the district court's determination that the officers did not use coercive tactics.

Ramirez further alleges that the officers deceived him about evidence and misled him to believe that he would not be liable if he did not kill Vasquez. The transcript of the interrogation does not support Ramirez's argument. Hanson and Leatherman correctly recited the facts concerning the bloody clothes and what the neighbors witnessed. There was only one instance when Hanson and Leatherman even arguably misled Ramirez. At one point, Ramirez asked whether the police had his fingerprints; Lagunas interpreted the question as "[d]o you have fingerprints?" Leatherman answered "[w]e have fingerprints" and Lagunas interpreted "they have fingerprints." However, before Ramirez made any incriminating statements, Hanson and Leatherman clarified that they had Chavez's fingerprints on the revolver. In support of his argument the officers misled him, Ramirez only points to an exchange in which Hanson stated, and Lagunas interpreted, "If you didn't kill him * * * It's important that you * * * That you tell the truth." The transcript shows that the officers did not make any implied or direct promises. In fact, Leatherman told Ramirez that he could not make any promises and would tell the county attorney what Ramirez said.

The district court found that there was no evidence that the police used an interrogation technique that was unduly coercive, deceptive, or stress-inducing. The evidence supports the court's finding. We hold that the court did not err in concluding that Ra-

mirez's statement was freely and voluntarily given.

## III.

We next address whether it is appropriate in this case to use our supervisory power to enforce the use of independent qualified interpreters during custodial interrogation of a non-English speaking suspect. In *State v. Scales*, this court exercised its supervisory power and held that all custodial interrogations shall be electronically recorded and that failure to comply may result in suppression of the defendant's statement. 518 N.W.2d 587, 592 (Minn.1994). In issuing this mandate, the *Scales* court noted that police officers had ignored the court's prior directives. *Id.* at 591–92.

Ramirez contends that, even if this court holds that there is no constitutional basis to suppress his statements, this court should reverse his conviction pursuant to its supervisory power because police officers are failing to obtain independent qualified interpreters in violation of this court's admonition in *Mitjans*. Ramirez also cites the final report of the Race Bias Task Force which states that "[t]he use of incompetent interpreters, or police officers serving as interpreters, must not be permitted" in criminal cases. Minnesota Supreme Court Task Force on Racial Bias in the Judicial System, Final Report 75 (May 1993), *reprinted in* 16 Hamline L.Rev. 477 (1993).

Although Minn.Stat. §§ 611.30–.33 require police officers to obtain an independent qualified interpreter prior to interrogation, this court has declined to suppress a statement on that basis. In *Mitjans*, this court held that the legislature did not create a constitutional right and did not mandate suppression of the defendant's statements in enacting Minn.Stat. §§ 611.30–.33. 408 N.W.2d at 830. Although this court held that the statements were properly admitted in *Mitjans*, it commented that, "[i]n the future, prudent police investigators who wish to reduce substantially the risk of subsequent suppression of statements taken from suspects with language handicaps are advised to comply with [the requirements of Minn.Stat. §§ 611.30–.33]" and "to consider seriously"

either tape recording the statement or transcribing the statement in the defendant's own language and having the defendant sign it. *Id.* at 831. We reiterate that admonition and do not intend to diminish the effect of *Mitjans.*

 Nevertheless, the circumstances in this case do not support imposition of our supervisory powers. Hanson and Leatherman had to travel to Kansas to interrogate Ramirez. They did not speak Spanish and did not have access to an interpreter with whom they had prior experience. Although Lagunas, a police officer, was used as an interpreter, he had no prior role in the investigation. The Liberal police had used Lagunas routinely as a Spanish–English interpreter. Leatherman gave Lagunas a card containing the *Miranda* warning and asked him to interpret the rights for Ramirez. Hanson and Leatherman observed Lagunas and Ramirez talking to each other; thus they had reason to believe Lagunas was properly interpreting the warning. In addition, Hanson and Leatherman did not deliberately ignore our prior directives. Hanson and Leatherman tape recorded the interrogation and it was subsequently translated and transcribed. Based upon the facts and circumstances, we deem it inappropriate to exercise our supervisory power in this case.

## IV.

 The remaining issue is whether the evidence admitted at trial is sufficient to sustain the jury's verdict of guilty of aiding and abetting attempted first-degree murder. Ramirez contends that the evidence is insufficient to prove that he intended to assist Chavez in harming Vasquez or that he actively participated in causing Vasquez's death.

In determining whether evidence is sufficient, this court thoroughly reviews the record to determine if the evidence was sufficient to permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense charged. *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994). This court reviews the facts in the record and the legitimate inferences drawn from the facts in the light most favorable to the jury's verdict and assumes that the jury believed the state's witnesses and disbelieved any contrary evidence. *Id.*

 Circumstantial evidence is entitled to as much weight as any other kind of evidence and a conviction based on circumstantial evidence will be upheld so long as the evidence and the reasonable inferences drawn from that evidence are consistent with the defendant's guilt and are inconsistent with any rational theory except that of guilt. *State v. Ostrem,* 535 N.W.2d 916, 923 (Minn. 1995). Thus, on appeal, a defendant must demonstrate that there is evidence in the record that is consistent with a rational theory other than guilt. *Id.* The jury is in the best position to evaluate the evidence surrounding the crime and to determine the weight and credibility of the witnesses' testimony. *Steinbuch,* 514 N.W.2d at 800; *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989).

 Ramirez was convicted of aiding and abetting first-degree murder. A defendant may be liable for a murder committed by a principal if the defendant "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures" the principal to commit the crime. Minn.Stat. § 609.05, subd. 1. A defendant may be liable for the principal's crime even though the principal was not convicted. *Id.* § 609.05, subd. 4.

 To convict the defendant of aiding and abetting, the state need not prove that the defendant actively participated in the overt act that constitutes the primary offense. *State v. Pierson,* 530 N.W.2d 784, 788 (Minn.1995). But more than passive acquiescence or inaction is required. *Id.* A jury may infer the requisite mens rea when the defendant "plays some knowing role in the commission of the crime and takes no steps to thwart its completion." *Id.* The defendant's presence at the crime scene is not enough, by itself, to convict him of aiding and abetting murder. *Ostrem,* 535 N.W.2d at 924. But the jury may consider the defendant's presence, along with the defendant's role in the murder, the defendant's lack of objection or surprise, the defendant's flight from the scene with the principal, and the defendant's companionship or association

with the principal before and after the crime. *See Pierson,* 530 N.W.2d at 788; *State v. Souvannarath,* 545 N.W.2d 30, 34 (Minn. 1996).

The record in this case, viewed in the light most favorable to the jury's verdict, demonstrates that there is sufficient evidence to sustain the verdict. The jury could have found that Ramirez played a role in a drug trafficking operation that involved Chavez.[6] The jury could have believed that, at Chavez's request, Ramirez arranged for Vasquez to meet Chavez at the time and place of the murder. Ramirez admitted in his statement to the police that he arranged the meeting by contacting Vasquez. Vasquez's girlfriend testified that, shortly before his murder, Vasquez received a telephone call, appeared to be worried, and left the house. The jury could have believed that Ramirez used his relationship as Vasquez's friend to lure Vasquez to the murder scene.

Based upon Ramirez's statements to the police, the jury could have concluded that Ramirez knew, when he arranged the meeting, that Vasquez owed Chavez money. Ramirez knew that Vasquez was a drug addict, did not have enough income to support his drug habit, "was entangled with [Chavez] for the drugs," owed "a lot of money," and if Vasquez did not pay, he would be killed. Ramirez admitted that he knew Chavez was angry, knew that Chavez "had problems with [Vasquez]," knew Vasquez was afraid of Chavez, and believed that Chavez and Vasquez were going to "fix their affairs." Some of Ramirez's other statements to the police demonstrate that he knew Chavez would be dangerous if Vasquez failed to pay the money he owed. Whether Ramirez could reasonably foresee that Vasquez would be murdered was a fact question for the jury to decide. *See State v. Atkins,* 543 N.W.2d 642, 646 (Minn.1996). Based upon the evidence admitted at trial, the jury could have reasonably believed that Ramirez knew, when he arranged the meeting, that Chavez wanted Vasquez to pay money for drugs and that Vasquez would be murdered if he failed to pay.

It was the state's theory at trial that Vasquez arrived at 246 East Annapolis, was brought to the basement, and was confronted by Chavez. Then, when Vasquez was unable to pay his debt, Chavez shot Vasquez. The state argued that Vasquez attempted to escape by running up the stairs, that Chavez continued shooting at Vasquez, and that Vasquez fell inside the back door, at which time Chavez stepped on Vasquez and delivered the lethal shot to the head. The evidence supports the state's theory. Ramirez admitted that Chavez and Vasquez argued about money. Based upon a forensic scientist's testimony, the jury could have concluded that the location and angle of the bullets recovered from the stairwell wall and ceiling demonstrated that Chavez shot at Vasquez twice while pursuing Vasquez up the basement stairway. The bloody shoeprint found on Vasquez's body supports the theory that Chavez stepped on Vasquez before firing the final shot, at close range, into Vasquez's head. The medical examiner testified that the shot to the head was the cause of Vasquez's death. The revolver that was the murder weapon was found on Vasquez's body, the serial number had been filed off, and the revolver contained Chavez's fingerprint.

In his statement to the police and his testimony at trial, Ramirez admitted that he was present at 246 East Annapolis when Vasquez was murdered, but asserts that he was just inside the door and did not see the shooting. The jury could have interpreted the evidence to find that Ramirez actually played a more active role. In his trial testimony, Ramirez admitted that when he vomited, he was standing between Vasquez and the exit. This is confirmed by the BCA finding vomit on Vasquez's pants leg. Ramirez testified that when Vasquez approached the back door, Ramirez left the house before Vasquez fell, leaving the door a

---

6. The state presented a plethora of evidence regarding illegal drug activity, including some evidence of drug activity at 246 East Annapolis, where Ramirez had been staying. On appeal, Ramirez admits that Chavez and Ramirez's uncle apparently "ran drugs" from Kansas to Minnesota. He also admits that he and others may have had varying levels of involvement in the drug business.

"little bit closed" behind him. However, this testimony is contradicted by the blood spatter evidence, which indicates that the back door was open when Vasquez was shot near the door. Ramirez's statement to the police confirmed that Vasquez was trying to get to the back door when he fell. Based upon Ramirez's statement to the police and the physical evidence, the jury could have disbelieved Ramirez's trial testimony and believed that Ramirez blocked Vasquez's exit as Vasquez was attempting to escape.

Ramirez denied that he drove Chavez to or from the residence. Ramirez's theory at trial was that a third man, a "Mr. Tough," was present with Chavez and that it was this man the neighbors saw leaving with Chavez. Ramirez argued that "Mr. Tough" was probably a hit man. Based upon the evidence, the jury could have found that Ramirez's theory was not credible.

Although Ramirez testified that he borrowed a white Cadillac to drive to the scene and parked in the back of the house near the Malibu, neighbors saw the Malibu at the scene but did not see a white Cadillac.[7] Dugger's testimony on this point is compelling—he sells used cars for a living, knows them well, and testified that "a white Cadillac around there sticks out pretty good." In addition, while the descriptions given by the three neighbors who witnessed two men leaving 246 East Annapolis shortly after the shots were fired were not identical in every detail, they were remarkably similar. Based upon the descriptions given by the three neighbors, Brandon's identification of Ramirez from a photographic lineup, and Ramirez's admission that the Malibu was the car he normally used, the jury could have reasonably believed that Ramirez drove Chavez to and from the scene in the Malibu.

Based upon Brandon's testimony that Ramirez appeared to try to push something inside the door, the jury could have believed that Ramirez tried to push Vasquez's body away from the door so the door would close.

The jury also could have determined that Ramirez drove Chavez to the Boyd Motel where Chavez disposed of Chavez's bloody clothes and Reebok tennis shoes. Ramirez admits that he went to the motel after the murder and admits he believed Chavez would be there, but denies driving Chavez to the motel. Based upon the neighbors' description of the driver and passenger of the Malibu and the fact that the Malibu was Ramirez's car, the jury could have believed that Ramirez drove Chavez from 246 East Annapolis to the motel. The police found bloody clothes and bloody Reeboks in a dumpster at the motel. The BCA determined that the Reeboks could have made the bloody shoeprints outside 246 East Annapolis and that the blood on the Reeboks matched Vasquez's blood.

Finally, the jury could have believed that Ramirez's flight to Kansas evinced his consciousness of guilt. *See State v. Bias*, 419 N.W.2d 480, 485 (Minn.1988). Ramirez admits that he left Minnesota without telling anyone about Vasquez's murder. Although Ramirez testified that he had previously planned to go to Kansas, the jury could have disbelieved his testimony, especially in light of Ramirez's testimony that on the night of the murder his cousin's husband lent him a car and told him to leave town and he left Minnesota that night.

In asserting that the evidence is insufficient, Ramirez relies on *State v. Ulvinen*, 313 N.W.2d 425 (Minn.1981). In *Ulvinen*, this court held that evidence was insufficient to support a mother's conviction for aiding and

---

7. Ramirez's testimony regarding his mode of transportation on the day of and the day before the murder was convoluted. Ramirez testified that, on the day before the murder, he had driven from 246 East Annapolis to his cousin's house in his Malibu and that same evening he was driven from his cousin's house to the Boyd Motel in Chavez's Taurus. He testified that, on the day of the murder, he took a cab from the Boyd Motel to his cousin's house. He testified that at 5:30 p.m. he borrowed his cousin's Cadillac without her permission and drove to 246 East Annapolis.

Ramirez explained that he borrowed the Cadillac because Chavez had borrowed his Malibu. He further explained that he drove to his cousin's house to return the Cadillac after the murder because he was afraid she would be mad that he borrowed it; he then walked a couple of blocks and took a cab to the Boyd Motel. Ramirez testified that, shortly after arriving at the Boyd Motel, his cousin's husband told him to leave town and lent him a red Cougar to drive to Kansas.

abetting her son in killing his wife. *Id.* at 429. As this court previously has recognized, the actions allegedly performed by the defendant in *Ulvinen* predominantly took place after the murder. *See State v. Johnson,* 450 N.W.2d 103, 106 (Minn.1990) (discussing *Ulvinen* ). In this case, there is substantial evidence of Ramirez's involvement before and at the time of the murder. We conclude that the evidence in the record supports the jury's guilty verdict.

Affirmed.